## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| DOUGLAS JONES, | : | | |
| | : | | |
| *Plaintiff*, | : | Civil Action No.: | 21-836 (RC) |
| | : | | |
| v. | : | Re Document No.: | 41 |
| | : | | |
| DISTRICT OF COLUMBIA, *et al.* | : | | |
| | : | | |
| *Defendants.* | : | | |

## <u>MEMORANDUM OPINION</u>

### Granting In Part Defendant's Motion for Summary Judgment and Remanding Case

## I. INTRODUCTION

In December 2017, Plaintiff Douglas Jones had a contentious encounter with officers of the District of Columbia's Metropolitan Police Department ("MPD"), including Officer Lloyd Coward and Defendant Sergeant Timothy Evans. During the encounter, Mr. Jones vocally criticized Officer Coward; shortly after, Sergeant Evans threatened to arrest Mr. Jones, chased and pushed him, and repeatedly swapped insults with him. Based on these events, Mr. Jones brought several claims against the District, Officer Coward, and Sergeant Evans, but after prior motions were resolved in this case, only his claim brought under 18 U.S.C. § 1983 for an alleged violation of his rights under the First Amendment and a common law tort claim for intentional infliction of emotional distress (abbreviated as "IIED") remain, both brought against Sergeant Evans. Now, Sergeant Evans moves for summary judgment. For the reasons explained below, the Court grants the motion in part and remands the remainder of the case to the Superior Court for the District of Columbia.

## II.  BACKGROUND

This case is about an incident between Mr. Jones and Sergeant Evans that lasted "approximately four and a half minutes."  *See* Defendant's Statement of Material Facts as to Which There is No Genuine Dispute ("DSMF") ¶ 42, ECF No. 41; *see also* Defendant's Motion for Summary Judgment ("Mot. Summ. J."), ECF No. 41.  Almost the entire duration of this encounter was captured on video, at times from multiple angles.  *See* Officer Coward Body-Worn Camera Video ("Coward BWC")*,* Def. Ex. 2, ECF No. 41-2; Sergeant Evans Body-Worn Camera Video ("Evans BWC"), Def. Ex. 5, ECF No. 41-5; Officer Thermidor Body-Worn Camera Video ("Thermidor BWC"), Def. Ex. 7, ECF No. 41-7.[1]  The parties disagree at times about how to characterize the behavior and intent of Mr. Jones and Sergeant Evans.  Still, the general course of events is beyond any reasonable dispute.

### 1.  The December 5, 2017 Incident

On December 5, 2017, at approximately 12:45pm, both Mr. Jones and Sergeant Evans were outside the King-Greenleaf Recreation Center in Southwest D.C.  DSMF ¶ 1; Pl.'s Statement of Material Facts as to Which a Genuine Dispute Exists ("PSMF") ¶ 1, ECF No. 42.  While Mr. Jones was walking through the Recreation Center's courtyard on his way to use a restroom inside the building, *see* DSMF ¶ 1, Sergeant Evans was helping Officer Ivens Thermidor with an investigatory stop near the building's entrance, *id.* ¶ 2.  Sergeant Evans ran the government-issued identification card of a second individual who had been near the first

---

[1] Sergeant Evans also introduces a video that was recorded by a civilian eyewitness, but the Court does not rely on this video because it is very low resolution, only 35 seconds long, and covers events captured on other videos.  *See* Eyewitness Camera Phone Video, Def. Ex. 6, ECF No. 41-6.

individual before Sergeant Evans and Officer Thermidor initiated the stop, and Sergeant Evans relayed the first individual's name to dispatch. *Id.* ¶¶ 3–5.

 As Mr. Jones walked down the pathway to the Recreation Center, he spoke out on his belief that law enforcement did not contribute to justice but instead was part of white supremacy. PSMF ¶ 2; Coward BWC 0:05–0:34.  According to Mr. Jones, he was unaware that MPD officers were conducting an investigatory stop near the Recreation Center's entrance, PSMF ¶ 7, although Officer Coward was directly in his field of view and appears to have at least partially inspired Mr. Jones's comments, Coward BWC 0:02–0:34.  Video footage shows other civilians were near the entrance, including one riding a bike on the same path in the area where Mr. Jones was heading. *See, e.g.*, Coward BWC 0:02–0:34.

As Mr. Jones walked on, Officer Coward intercepted Mr. Jones and blocked him from proceeding. *Id.* 0:30–0:34.  Officer Coward also pressed his arm against Mr. Jones, although this movement was relatively light and did not involve much pressure. *Id.*  In response, Mr. Jones told Officer Coward that he was "minding my business." *Id.*  Officer Coward continued to hold his arm up against Mr. Jones to block him, telling Mr. Jones that "we busy down here." *Id.*  Mr. Jones immediately raised both of his hands above his shoulders in a surrender position and asked Officer Coward to "get your hands off me." *Id.* 0:34–0:37.  Officer Coward told Mr. Jones to "mind [his] business" and "don't come down here bro." *Id.* 0:34–0:40.  Mr. Jones responded "don't put your hands on me, don't touch me, don't none of y'all touch me" as he pointed his finger at Officer Coward, who by then was no longer touching Mr. Jones. *Id.* 0:38–0:44.  Mr. Jones continued to yell that Officer Coward had "put his hands" on him. *Id.*

Sergeant Evans saw Mr. Jones pointing his finger at Officer Coward and shouting at him; he approached the situation as he called for "more units down here" on his radio.  Evans BWC,

3:00–3:10.  Sergeant Evans asked Mr. Jones "what's going on with you man? Hey, just relax. Just relax. Sir. Sir." without seemingly attracting his attention.  *Id.* 3:05–3:15.  Mr. Jones, still upset that Officer Coward had touched him, persisted in shouting at Officer Coward: "What's wrong with you? You can't put your hands on me. Don't put your hands on me. Don't touch me. You are trained . . . Don't touch me . . . Man, you don't intimidate me. You a coward. You a fucking coward." *Id.* 3:05–3:20.  Officer Coward then shoved Mr. Jones with enough force to make Mr. Jones take several steps backward. *Id.* 3:20–3:25.  Sergeant Evans moved closer to Mr. Jones, who again put his hands up, yelling "You see that?" *Id.*  Mr. Jones demanded that Sergeant Evans arrest Officer Coward, saying that "[h]e assaulted me in front of you, you arrest him." *Id*. 3:20–3:30.

At this point, Mr. Jones and Sergeant Evans were in close physical proximity.  Sergeant Evans became agitated that Mr. Jones was so close to him, yelling "Why are you getting in my face?" *Id.*  Mr. Jones answered "Get in your face? You come up on me!" *Id.*  Sergeant Evans then shouted "Do you want to go to jail?" three times at Mr. Jones.  *Id.* 3:30–3:35.  Mr. Jones began backing up, while Sergeant Evans said "[y]ou ain't scaring nobody big man. Go on down the road. Go on down the road now. Now!" *Id.*  3:30–3:40.  Mr. Jones started to walk away but commented that Sergeant Evans "stinks" and his "breath stinks." *Id.* 3:35–3:40.  Sergeant Evans shouted back that "[y]our breath stinks too, ass!" and "[y]ou smell like ass!" *Id.* 3:40–3:45.

Another officer put his hand on Mr. Jones's arm, who yelled "don't touch me" and ran away toward nearby picnic tables.  Coward BWC 1:27–1:35.  Sergeant Evans ran after Mr. Jones, screaming "Hey! Hey! Hey!" *Id.*  At this point, Officer Coward remained at a distance for the rest of the encounter, although still close enough to observe and record the interaction between Mr. Jones and Sergeant Evans.  *See generally* Coward BWC.  By the picnic tables, two

other officers also approached Mr. Jones, who said "don't touch me" and "get the fuck away

from me." *Id.* 1:27–1:38.  Sergeant Evans also yelled back "don't touch me" repeatedly—Mr.

Jones was not touching him—and told Mr. Jones "you're on camera." *Id.* 1:27–1:40; Evans

BWC 3:55–4:00.

     Mr. Jones again turned away and was met by Sergeant Evans blocking his path.

Thermidor BWC 5:55–6:00.  There was brief physical contact between Mr. Jones's stomach and

Sergeant Evans's chest.  *Id.*  The parties continued yelling, with Sergeant Evans asking "why are

you pushing me man" although Mr. Jones did not push Sergeant Evans.  *Id.* 5:50–6:00.

     An already heated situation then turned vulgar.  Although the Court will spare the reader

from the precise language, Mr. Jones began shouting homophobic slurs at Sergeant Evans.  *Id*.

Sergeant Evans pushed his chest against Mr. Jones and replied with the same slur.  *Id.*  Mr. Jones

referenced his genitalia, yelling at Sergeant Evans that he had "a black dick to annihilate you in

the birth canal," which Sergeant Evans responded to with a mocking "ooooo" sound.  *Id.* 6:00–

6:05.  Mr. Jones also made a comment about Sergeant Evans's gun, saying "you need a gun" to

apparently imply that Sergeant Evans was cowardly and needed a gun to be brave enough for

confrontation.[2]  *Id.;* Evans BWC 4:08–4:09.  Mr. Jones again repeated slurs to Sergeant Evans;

Sergeant Evans made further insinuations about Mr. Jones's sexual conduct and sexual

orientation, calling him an "undercover brother."  Thermidor BWC 6:05–6:14.  Both individuals

continued to insult one another with vulgar remarks about the other's sexual orientation.  *Id.*

     Mr. Jones yelled "hey, look at this dick" to nearby officers—referring to Sergeant Evans

---

[2] Sergeant Evans initially contended that "[a]t one point during this exchange, Plaintiff
asked Sergeant Evans to give him his gun."  *See* Mot. Summ. J. at 4.  The video does not support
this description, and on reply, Sergeant Evans conceded that "Plaintiff said 'you need a gun' and
did not ask for Sergeant Evans's gun."  Defendant's Response to Plaintiff's Statement of
Material Facts in Genuine Dispute, at 5 n.1, ECF No. 44.

as a "dick"—and Sergeant Evans told Mr. Jones that if he "come[s] up talking to us we're gonna talk back to you," and again shoved Mr. Jones with his chest. *Id.* 6:15–6:30. Sergeant Evans was irritated that Mr. Jones spoke to a different officer, screaming "you talk to me." *Id.* Sergeant Evans then spit on Mr. Jones, who grabbed his face and said "[h]e just spit in my face." *Id.* 6:30–6:35.

The parties strongly dispute whether the spitting was intentional. According to Sergeant Evans, "any spit expelled from Sergeant Evans's mouth was unintentional and incidental to his speech." *See* Mot. Summ. J. at 5, ECF No. 41. Mr. Jones argues that Sergeant Evans's head "rears back and comes forward in a spitting motion." Pl. Opp'n to Mot. Summ. J ("Pl. Opp'n") at 4, ECF No. 42. The video evidence is not entirely conclusive on this issue, but it seems that Sergeant Evans spit accidentally while loudly yelling into Mr. Jones's face.

After the spitting, Mr. Jones again tried to distance himself from the situation, with Sergeant Evans chasing him out of the courtyard and asking him "[w]here you going man?" Thermidor BWC 6:29–6:45. Sergeant Evans apparently again forced his body onto Mr. Jones and his body worn camera fell to the ground. *Id.;* Evans BWC 4:40–4:45. Mr. Jones put his hands up in a surrender motion while Sergeant Evans and Officer Thermidor approached him, and then Mr. Jones retreated into the parking lot. Thermidor BWC 6:29–6:45. Another civilian stood in between Mr. Jones and Sergeant Evans; an MPD officer grabbed Sergeant Evans to keep him from pursuing Mr. Jones. *Id.* 7:03–7:11. Mr. Jones left the Recreation Center Courtyard while Sergeant Evans yelled more taunts at him, telling him to "[g]o on down the road . . . with your big mouth, with your sorry ass!" *Id.* 6:44–7:12.

As Mr. Jones—by then a fair distance away—told other nearby individuals that Sergeant Evans had spit on him, Sergeant Evans shouted from across the courtyard "[y]ou want to get

loud, go down the street, ass! You don't get loud over here!" *Id.* 7:30–7:45.  Sergeant Evans
retrieved his MPD bicycle and chased toward Mr. Jones, calling after him. *Id.* 9:01–9:06.  Mr.
Jones continued to leave the King-Greenleaf Recreation Center, and Sergeant Evans gave up his
pursuit.

### 2.  Mr. Jones's Emotional Distress

Mr. Jones alleges that he was negatively impacted by the incident, and played
"basketball, exercised, and meditated" as self-treatment for his distress.  Jones Deposition 38:14–
39:08, Pl. Ex. 2, ECF No. 42-2.  Years later, Mr. Jones still allegedly experienced extreme
impairment to his daily functioning based on his encounter with Sergeant Evans.  Nadia
Tourinho Deposition, 37:13–38:22, 49:1–50:01; 55:01–56:22, Pl. Ex. 9, ECF No. 42-9.  That
impairment included a fear of law enforcement, desire to stay at home, poor sleep, difficulty
interacting with others, and loss of appetite, as well as feelings of hopelessness and anxiety. *Id.*
37:13–38:22, 49:1–50:01; 55:01–56:22.  In 2021, over three years after the incident, Mr. Jones
began visiting a therapist to address his encounter with Sergeant Evans. *Id.* 69:5–6.  His
therapist concluded that Mr. Jones had not gotten over the incident and suffered severe emotional
distress from it. *Id.* 52:16–56:05; 106:13–106:21.  Mr. Jones attended a total of five sessions,
where he was diagnosed with "unspecified adjustment disorder." *Id.* 48:6–12.  He is still able to
work despite his emotional distress.  Jones Deposition 25:10–20.  Mr. Jones says that he
benefitted from therapy, and that he believed more sessions were needed, but he could not afford
them. *Id.* 39:09–20.

### 3.  Procedural History

On December 2, 2020, Mr. Jones filed a seven-count complaint in the Superior Court for
the District of Columbia, seeking damages from Officer Coward, Sergeant Evans, and the

District of Columbia.  *See* Compl., ECF No. 1-2.  First, Mr. Jones brought three counts under 42 U.S.C. § 1983, which affords a cause of action for individuals alleging that persons acting under color of District of Columbia law have violated their constitutional rights.  Count I alleged Officer Coward and Sergeant Evans unlawfully arrested him and used excessive force against him in violation of the Fourth Amendment.  *Id.* ¶¶ 43–60.  Count II alleged that Sergeant Evans violated the First Amendment by threatening to arrest Mr. Jones in retaliation against his protected speech about Officer Coward.  *Id.* ¶¶ 61–67.  Count III alleged that Officer Coward was liable for failing to intervene and stop Sergeant Evans's alleged unlawful detention of, and use of, unnecessary force against Jones.  *Id.* ¶¶ 68–74.

The other four counts were District of Columbia common law tort claims.  Mr. Jones brought a claim for intentional infliction of emotional distress against Sergeant Evans (Count IV) alleging that Sergeant Evans pursued, insulted, made physical contact with, and generally harassed Mr. Jones.  *Id.* ¶¶ 75–81.  He also brought claims for negligent infliction of emotional distress against both Officer Coward and Sergeant Evans (Count V), for negligence against both Officer Coward and Sergeant Evans (Count VI), and for vicarious liability for all tort claims under the doctrine of *respondeat superior* against the District of Columbia (Count VII).  *Id.* ¶¶ 75–104.

Sergeant Evans removed the action to this Court.  Notice of Removal, ECF No. 1. Officer Coward, Sergeant Evans, and the District of Columbia moved to dismiss Counts I, III, IV, V, VI, and VII—although not Count II, the First Amendment retaliation claim—for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).  *See* Defs.' Mot. Dismiss*,* ECF No. 6.  To properly consider an affidavit exhibit attached to the motion, the Court converted the motion into a partial motion for summary judgment under Federal Rule of Civil Procedure 56,

insofar as the motion related to Count VII.  *See* Order Partially Converting Mot. Dismiss, ECF No. 11.

The Court granted the motion for Counts I, III, V, VI, and VII, which included all counts against Officer Coward and the District.  Mr. Jones's unlawful seizure claim failed because Sergeant Evans and Officer Coward's actions did not constitute a seizure, and to the extent that any doubt remained about Officer Coward's conduct, he was protected by qualified immunity. *Jones v. District of Columbia*, No. 21-cv-836, 2021 WL 5206207, at *3 (D.D.C. Nov. 9, 2021). Similarly, Mr. Jones's excessive force claim against Sergeant Evans and Officer Coward—based on Officer Coward shoving him and Sergeant Evans bumping him and allegedly spitting on him—failed because Mr. Jones had not sufficiently alleged a seizure, which is a necessary element of a Fourth Amendment excessive force claim.  *See id.* at *9.  Because the Court dismissed the Fourth Amendment charges against Sergeant Evans, it also dismissed the Fourth Amendment-based bystander liability claim against Officer Coward.  *See id.* at *10.  The Court also dismissed Mr. Jones's negligent infliction of emotional distress and negligence claims because he failed to plead crucial aspects of those claims.  *See id*. at *12–13.  And his attempt to hold the District liable for any of these common law torts under *respondeat superior* failed because Mr. Jones had not provided pre-suit notice of his damages.  *Id.* at *13.

Two claims that were only asserted against Sergeant Evans, Count II (First Amendment Retaliation) and Count IV (Intentional Infliction of Emotional Distress), survived the motion.  As explained, Sergeant Evans had not moved to dismiss Count II.  And as for Count IV, the Court determined that after taking Mr. Jones's allegations as true and construing them "liberally in his favor," he had sufficiently pleaded that Sergeant Evans's conduct was "extreme and outrageous in context."  *Id.* at *12.  The case proceeded on to discovery for both remaining counts.

Now, Sergeant Evans moves for summary judgment, arguing that Mr. Jones has failed to establish a *prima facie* First Amendment retaliation claim, or alternatively that Sergeant Evans's actions fall under the protection of qualified immunity.  *See* Mot. Summ. J. at 7; Reply Sup. Mot. Summ. J. at 5 ("Reply"), ECF No. 44.  He also argues that Mr. Jones cannot establish a *prima facie* case for IIED.  *See* Mot. Summ. J at 12; Reply at 11.  Mr. Jones has filed an opposition to the motion.  *See* Pl. Opp'n.

### III.  LEGAL STANDARD

### A.  Qualified Immunity

Section 1983 of Title 42 of the United States Code affords a plaintiff with a cause of action against a state actor who allegedly violated his constitutional rights.  *See Butera v. District of Columbia,* 235 F.3d 637, 645 (D.C. Cir. 2001).  The doctrine of qualified immunity shields state actors from "liability for civil damages if their actions did not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (per curiam) (internal quotation marks and citation omitted).  In application, state actors are entitled to qualified immunity under 42 U.S.C. § 1983 "unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'"  *District of Columbia v. Wesby*, 583 U.S. 48, 62–63 (2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)).  "'Clearly established' means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful."  *Id.* (internal quotation marks and citation omitted).  "In other words, existing law must have placed the constitutionality of the officer's conduct beyond debate."  *Id.* (quotation omitted).

To assess existing law, the Court refers "to cases from the Supreme Court and [the D.C. Circuit], as well as to cases from other courts exhibiting a consensus view." *Bame v. Dillard*, 637 F.3d 380, 384 (D.C. Cir. 2011) (citation omitted).  The existing law analysis is stringent but "there is no need that 'the very action in question [have] previously been held unlawful.'" *Navab-Safavi v. Glassman*, 637 F.3d 311, 317 (D.C. Cir. 2011) (quoting *Wilson v. Layne*, 526 U.S. 603, 615 (1999)); *see also Kisela v. Hughes,* 584 U.S. 100, 104 (2018) ("Although this Court's caselaw does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate.") (internal quotation marks and citation omitted).

While "[a] defendant must first raise the defense of qualified immunity . . . once asserted, the burden of proof falls to the plaintiff to show that the official is not entitled to qualified immunity." *Campbell v. District of Columbia*, 245 F. Supp. 3d 78, 85 (D.D.C. 2017) (cleaned up); *see also Dukore v. District of Columbia*, 799 F.3d 1137, 1145 (D.C. Cir. 2015).  When qualified immunity is raised at the summary judgment stage, it leads to a "two-pronged inquiry." *Tolan*, 572 U.S. at 655.  The first prong looks to "whether the facts, [t]aken in the light most favorable to the party asserting the injury, . . . show the officer's conduct violated a [federal] right[.]" *Id.* at 655–56 (alterations in original) (internal quotation marks and citation omitted). The second prong assesses the legal rules that were clearly established to determine whether those rules gave the officer "fair notice" that his conduct was contrary to law.  *City & Cnty. of San Francisco v. Sheehan*, 575 U.S. 600, 616 (2015) (internal quotation marks and citation omitted).  A court may consider the prongs in any order.  *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).  To defeat a claim of qualified immunity, both prongs must yield an affirmative answer.

11

## B.  Summary Judgment

Under Rule 56 of the Federal Rules of Civil Procedure, a court must grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" if it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248 (1986).  And a dispute is "genuine" if there is enough evidence for a reasonable jury to return a verdict for the non-movant.  *See Scott v. Harris*, 550 U.S. 372, 380 (2007).  Accordingly, the Rule 56 inquiry addresses "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson*, 477 U.S. at 251–52.

A principal purpose of summary judgment is to determine whether there is a genuine need for trial by "dispos[ing] of factually unsupported claims or defenses."  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).  The movant bears the initial burden of identifying portions of the record that demonstrate the absence of any genuine issue of material fact.  *See* Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 323.  In response, the non-movant must point to specific facts in the record that reveal a genuine issue that is suitable for trial.  *See* Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 324.  "[T]he non-movant 'may not rest upon mere allegation or denials . . .' but must [instead] present 'affirmative evidence' showing a genuine issue for trial." *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987) (quoting *Anderson*, 477 U.S. at 256).

 A court considering a summary judgment motion must "eschew making credibility determinations or weighing the evidence."  *Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007).  Inferences must be analyzed in the light most favorable to the non-movant.  *See*

*Anderson*, 477 U.S. at 255.  But conclusory assertions offered without any evidentiary support do not establish a genuine issue for trial.  *See Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).  As is true here, "in a case where the court has the benefit of video evidence, the Supreme Court has stated that courts deciding summary judgment motions should 'view[] the facts in the light depicted by the videotape[.]'"  *Armbruster v. Frost*, 962 F. Supp. 2d 105, 110 (D.D.C. 2013) (quoting *Scott*, 550 U.S. at 381).  "[E]ven where a summary judgment motion is unopposed, it is only properly granted when the movant has met its burden."  *Cromartie v. District of Columbia*, 479 F. App'x 355, 356 (D.C. Cir. 2012) (quoting *Alexander v. FBI*, 691 F. Supp. 2d 182, 193 (D.D.C. 2010)).

In the context of qualified immunity, "the court must 'first identify[ ] the version of events that best comports with the summary judgment standard and then ask[ ] whether, given that set of facts, a reasonable officer should have known that his actions were unlawful.'"  *Kyle v. Bedlion*, 177 F. Supp. 3d 380, 389 (D.D.C. 2016) (Jackson, K.B., J.) (quoting *Morelli v. Webster*, 552 F.3d 12, 19 (1st Cir. 2009)).  Once the Court has "'determined the relevant set of facts and drawn all inferences in favor of the nonmoving party to the extent supportable by the record,' the 'reasonableness of [the officer's] actions . . . is a pure question of law.'"  *Id.* (quoting *Scott*, 550 U.S. at 381 n.8).

## IV.  ANALYSIS

The Court considers Mr. Jones's § 1983 claim first because subject matter jurisdiction in this case derives from that federal cause of action.  *Wilkins v. District of Columbia*, No. 17-cv-884, 2020 WL 5816591, at *5 (D.D.C. Sept. 30, 2020) (turning to federal cause of action first).  Afterward, the Court will address Mr. Jones's IIED claim.  *Id.*

A.  Mr. Jones's First Amendment Claim Fails

1.  Nature of the Claim

To start, the Court must address Sergeant Evans's attempts to limit Mr. Jones's § 1983

claim.  At a high level, Mr. Jones alleges that he suffered retaliation, including a threat of arrest,

because of his protected speech.  "[A]s a general matter the First Amendment prohibits

government officials from subjecting an individual to retaliatory actions for engaging in

protected speech."  *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019) (internal quotation marks

and citation omitted).

Still, the Court is mindful of the well-worn principle that a plaintiff cannot amend his

complaint through opposition to a defendant's summary judgment motion.  *Petrucelli v. Dep't of

Just.*, 453 F. Supp. 3d 126, 135 (D.D.C. 2020) ("'[I]t is well-established in this district that a

plaintiff cannot amend his Complaint in an opposition to a defendant's motion for summary

judgment.'" (citations omitted)); *see also Jordan v. District of Columbia*, 161 F. Supp. 3d 45, 61

(D.D.C. 2016) ("[I]t is well settled that 'a plaintiff is not permitted to raise new claims at the

summary judgment stage, where those claims were not pleaded in the complaint.'" (citation

omitted)).

Citing that rule, Sergeant Evans argues that the only alleged retaliatory actions supporting

Mr. Jones's First Amendment claim are Sergeant Evans's threats of arrest.  *See* Reply at 3

("Although Plaintiff now claims otherwise, in his complaint, Plaintiff clearly limited the alleged

retaliatory conduct to Sergeant Evans's threat of arrest.").  Not so.  The complaint quite clearly

alleges that "Defendant Evans' threats and *subsequent harassment* [were] motivated by Mr.

Jones exercising his First Amendment rights."  Compl. ¶ 64 (emphasis added); *see also id.*

¶¶ 25–33 (alleging continued harassment by Sergeant Evans after the threat of arrest).  The Court

has little difficulty finding that the retaliation claim is based on Sergeant Evans's threats of arrest as well as his subsequent actions, such as following, pushing, and shouting at Mr. Jones.

However, the Court agrees with Sergeant Evans's assertion that Mr. Jones did not plead that he was retaliated against for speaking out about law enforcement, the justice system, or white supremacy.  Reply at 2.  A glance at the complaint shows that Mr. Jones's First Amendment claim is exclusively based on him expressing his "opinion of Defendant Coward's actions in the course of his duties as a police officer."  Compl. ¶ 62.  Nowhere does the complaint reference Mr. Jones making comments about law enforcement and white supremacy. And while Mr. Jones made those comments within eyesight and earshot of Officer Coward, it appears he was speaking to the open air rather than anyone specific.  *See* Coward BWC, 0:02–0:34.  Mr. Jones was also far away from Sergeant Evans, and the video evidence indicates that Sergeant Evans could not have heard these remarks.  *See* Evans BWC, 2:45–3:00.

Most importantly, as Sergeant Evans also notes, Mr. Jones's claim is solely based on his statements about Officer Coward.  Reply at 3 n.1; Compl. ¶ 62.  The complaint does not attribute Sergeant Evans's alleged retaliation to anything that Mr. Jones said about law enforcement generally or to anything he said about Sergeant Evans.  So while Officer Coward had ceased interacting with Mr. Jones by the time Sergeant Evans made his threat of arrest, Mr. Jones's claim relies on the idea that the additional alleged retaliation by Sergeant Evans was an exclusive response to Mr. Jones's comments about Officer Coward.  As will be discussed below in greater detail, that is a challenging argument in the context of Mr. Jones's aggressive and vulgar remarks directed at Sergeant Evans.

2.  Framework for First Amendment Retaliation

With the relatively narrow contours of Mr. Jones's First Amendment claim clarified, the

Court sets forth the applicable framework for resolving that claim.

> To establish a claim for retaliation under the First Amendment, an individual must prove (1) that he engaged in protected conduct, (2) that the government "took some retaliatory action sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again;" and (3) that there exists "a causal link between the exercise of a constitutional right and the adverse action taken against him."

*Doe v. District of Columbia*, 796 F.3d 96, 106 (D.C. Cir. 2015) (quoting *Aref v. Holder*, 774 F.

Supp. 2d 147, 169 (D.D.C. 2011)).

"To satisfy the causation link, a plaintiff must [show] that his or her constitutional speech

was the 'but for' cause of the defendants' retaliatory action." *Id.* (citation omitted); *see also*

*Nieves,* 139 S. Ct. at 1722 (stating that a plaintiff must show "the adverse action against the

plaintiff would not have been taken absent the retaliatory motive.").  Generally, this analysis is

subjective: "a plaintiff must demonstrate that the defendant[] w[as] 'subjectively motivated' to

take [the] retaliation action *because of* the plaintiff's protected activity."  *BEG Investments, LLC*

*v. Alberti*, 144 F. Supp. 3d 16, 22 (D.D.C. 2015) (quoting *Smith v. Mosley*, 532 F.3d 1270, 1278

(11th Cir. 2008)).  The Court may infer causation when a retaliatory act occurs soon after

protected activity; "the D.C. Circuit 'has held that a close temporal relationship may *alone*

establish the required causal connection.'"  *Id.* (quoting *Singletary v. District of Columbia*, 351

F.3d 519, 525 (D.C. Cir. 2005)).  Nevertheless, if a defendant offers undisputed evidence that he

believed in the lawfulness of his conduct, it will defeat a plaintiff's *prima facie* retaliation claim

regardless of the temporal proximity between the protected conduct and the retaliatory action.

*See Doe*, 796 F.3d at 107 (citing *Singletary*, 351 F.3d at 525).

Not all First Amendment retaliation claims are alike, however.  *Nieves*, which was decided two years after the events of this case, held that a plaintiff "pressing a retaliatory arrest claim must plead and prove the absence of probable cause for the arrest." *Nieves,* 139 S. Ct. at 1724.  The Supreme Court emphasized the longstanding practice that "when [courts are] reviewing an arrest, we ask 'whether the circumstances, viewed objectively, justify [the challenged] action,' and if so, conclude 'that action was reasonable *whatever* the subjective intent motivating the relevant officials.'" *Id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 736 (2011)).  Accordingly, in a retaliatory arrest case, "[a] particular officer's state of mind . . . provides 'no basis for invalidating an arrest.'"[3] *Id.* at 1725 (quoting *Devenpeck v. Alford*, 543 U.S. 146, 153, 155 (2004)).

Of course, this case is—in part—about retaliatory threat of arrest, rather than actual retaliatory arrest.  But the best reading of *Nieves* is that this objective standard extends to retaliatory threats of arrest.  Any other conclusion would lead to bizarre outcomes.  Consider two similarly situated officers who both have a subjective intent to retaliate as well as objective probable cause to arrest; one completes the arrest and the other does not.  There is no coherent reason why a plaintiff should be able to bring a claim against only one of those officers.  Such a result would run against the Supreme Court's warning that a "subjective approach" would allow "even doubtful retaliatory arrest suits to proceed based solely on allegations about an arresting officer's mental state." *Id.*  Indeed, if the *Nieves* framework did not apply to threats of arrest,

---

[3] *Nieves* provides for a "narrow qualification" to the probable cause rule in situations where officers have probable cause to make arrests, "but typically exercise their discretion not to do so." *Nieves*, 139 S. Ct. at 1727.  Specifically, "the no-probable-cause requirement should not apply when a plaintiff presents objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." *Id.; see Goodwin v. District of Columbia*, 579 F. Supp. 3d 159, 172 (D.D.C. 2022).

"[a]s a result, policing certain events like an unruly protest would pose overwhelming litigation risks." *Id.* It is easy to imagine why an officer might threaten a lawful arrest—for example, as a warning to bring a belligerent individual into compliance—but then not carry out that arrest. It is equally easy to imagine that without *Nieves*'s rule, such a threat may be accompanied by an "inartful turn of phrase or perceived slight" that could then "land an officer in years of litigation." *Id.*

Thus, the Court finds that a plaintiff alleging a retaliatory threat of arrest must show that, at the time of the threat, an officer would have lacked objective probable cause for an actual arrest. *See id.* at 1724. And it is unpersuaded by Sergeant Evans's argument that the proper inquiry looks at good faith subjective intent rather than objective probable cause. *See Reply* at 5. Sergeant Evans principally relies on *BEG Investments,* 144 F. Supp. 3d at 22 & n.6, which rejected the idea that probable cause was relevant to a First Amendment retaliation claim. *See* Reply at 5. *BEG Investments*, however, did not involve an actual or threatened arrest, and as explained above, there is strong reason to believe the rule is different when an officer's arresting authority is concerned, as it is here. *See* 144 F. Supp. 3d at 18–19.

As an aside, Sergeant Evans's proposed inquiry appears to generally be less protective of him—or other law enforcement officers—than the probable cause rule he disclaims, and that the Court endorses. A requirement that a plaintiff show that an officer making a threat of arrest lacked probable cause is a floor, not a ceiling. That plaintiff must still show that the threat was made with a retaliatory motive, which is where an officer's subjective intent kicks in. *See Nieves,* 139 S. Ct. at 1722. With that legal issue sorted out, the Court may move on to probable cause and Sergeant Evans's threat of arrest, while deferring its consideration of Sergeant Evans's other actions until later in this opinion.

### 3.  Probable Cause and the APO Statute

According to Sergeant Evans, at the point that he threatened Mr. Jones with arrest, he had probable cause to arrest Mr. Jones under the District of Columbia's Assault on a Police Officer ("APO") statute.  *See* Reply at 7 (citing Evans Deposition 73:18–76:13, Def. Ex. 4, ECF No. 41-4); Evans Deposition 73:22–74:2 (Q. "What has he done that's illegal?" A. "The correct charge would be assault on a police officer.").  That statute provides that anyone who "without justifiable and excusable cause assaults a law enforcement officer on account of, or while that law enforcement officer is engaged in the performance of his or her official duties shall be guilty of a misdemeanor[.]"  *See* D.C. Code § 22–405(b) (2016); *see also McGovern v. George Washington Univ.*, 245 F. Supp. 3d 167, 184 (D.D.C. 2017) ("To determine whether [an officer] had probable cause to believe that [a plaintiff was] violating District of Columbia law, we look to District law to identify the elements of [the offense]." (citation and internal quotation marks omitted)).

About 18 months before the events of this case, in June 2016, the Council of the District of Columbia "amended the statute prohibiting APO due to a concern that the statute was over inclusive." *Coleman v. United States*, 194 A.3d 915, 917 (D.C. 2018); *Bushrod v. District of Columbia*, 521 F. Supp. 3d 1, 17 (D.D.C. 2021) (same).  Previously, the APO statute provided that anyone who "without justifiable and excusable cause assaults, resists, opposes, impedes, intimidates, or interferes with a law enforcement officer on account of, or while that law enforcement officer is engaged in the performance of his or her official duties shall be guilty of a misdemeanor[.]"  *See* D.C. Code § 22–405(b) (2013).[4]  Thus, the newer 2016 version of the

---

[4] Unhelpfully, Mr. Jones's opposition only cites to this version of the statute, and cases interpreting it, rather than explaining that the statute was modified in 2016.  *See* Pl. Opp'n at 9.

APO statute no longer covers conduct that merely "resists, opposes, impedes, intimidates, or interferes with" a law enforcement officer.  In addition, a new separate offense addresses resisting arrest, specifying that "whoever without justifiable and excusable cause intentionally resists an arrest by an individual who he or she has reason to believe is a law enforcement officer or prevents that individual from making or attempting to make an arrest of or detain another person shall be guilty of a misdemeanor[.]"  *See* D.C. Code § 22–405.01 (2016).

The change in the statute has significant implications for the present motion.  The previous APO provision contained "broad wording," *Lin v. District of Columbia*, 47 F.4th 828, 843 (D.C. Cir. 2022), that meant an APO violation occurred when an individual's actions "cross the line into active confrontation, obstruction or other action directed against an officer's performance in the line of duty."  *Kyle,* 177 F. Supp. 3d at 396 (quoting *Howard v. United States*, 966 A.2d 854, 856 (D.C. 2009)).  The pre-2016 APO law did "not criminalize every refusal to submit to a police officer or every prevention or hindrance of an officer in his duties."  *Lin,* 47 F.4th at 843 (quoting *Ruffin v. United States*, 76 A.3d 845, 850 (D.C. 2013)).  Instead, "the key to establishing any violation of the [pre-2016] APO statute is the active and oppositional nature of the conduct for the purpose of thwarting a police officer in his or her duties."  *Ruffin,* 76 A.3d at 850 (quotation marks omitted) (quoting *Coghill v. United States,* 982 A.2d 802, 806 (D.C. 2009)).

When confronted with the question of whether a police officer had probable cause to arrest under the pre-2016 statute, a court observed that the relevant case law "demonstrate[d] the fuzzy parameters of D.C.'s APO crime."  *Kyle,* 177 F. Supp. 3d at 397.  That is because "each APO case involves 'balancing [that] must be conducted, on a case-by-case basis, in an intensely

factual analysis.'"[5] *Johnson v. District of Columbia*, 490 F. Supp. 3d 144, 158 n.4 (D.D.C. 2020) (quoting *In re C.L.D.*, 739 A.2d 353, 357 (D.C. 1999)).  Accordingly, amid that haze, courts often found that qualified immunity protected officers when the question was whether the officer had probable cause to arrest for APO.  *Id.* ("Such ambiguity [regarding the APO statute] hardly evinces a clearly established standard that would have placed [the arresting officer] on notice of the absence of probable cause for Plaintiff's arrest."); *Kyle*, 177 F. Supp. 3d at 397 n.8 (finding that plaintiff's "effort falls far short of demonstrating the 'controlling authority' or 'robust consensus of cases of persuasive authority' that is necessary to deprive the officers here of the cloak of qualified immunity.") (quoting *al-Kidd*, 563 U.S. at 741–42).

But this line of cases is no longer directly on point after the District of Columbia decided to change the APO statute in 2016.  The Court has not identified any cases that interpret the scope of the now-applicable APO statute, but the statute's reference to "assault[]," D.C. Code § 22–405 (2016), indicates that the Court should look to the District of Columbia's general definition of an assault.  There, the law provides that "[w]hoever unlawfully assaults, or threatens another in a menacing manner, shall be fined not more than the amount set forth in § 22-3571.01 or be imprisoned not more than 180 days, or both."  D.C. Code § 22–404(a)(1) (2013).

The D.C. Court of Appeals has observed that criminal assaults "fall into 'two distinct' categories: attempted battery assaults and intent-to-frighten assaults."  *Perez Hernandez v. United States*, 286 A.3d 990, 998 (D.C. 2022) (quoting *Robinson v. United States*, 506 A.2d 572, 574 (D.C. 1986)).  Attempted battery assaults are more common and involve offensive physical

---

[5] *Johnson*, 490 F. Supp. 3d at 149, was decided in 2020 but concerned an arrest that occurred in 2016.

contact.[6]  *Id.*  Here, Mr. Jones had not made physical contact with Sergeant Evans or Officer

Coward when Sergeant Evans threatened "do you want to go to jail?"[7]  Coward BWC 3:30–3:35.

Thus, the Court turns to intent-to-frighten assault, where

> In order to prove intent-to-frighten assault, the government must show "(1) that the
> defendant committed a threatening act that reasonably would create in another
> person a fear of immediate injury; (2) that, when he/she committed the act, the
> defendant had the apparent present ability to injure that person; and (3) that the
> defendant committed the act voluntarily, on purpose, and not by accident or
> mistake."

*Powell v. United States*, 238 A.3d 954, 957 (D.C. 2020) (quoting *Joiner-Die v. United States*,

899 A.2d 762, 765 (D.C. 2006)).  "A conviction of intent-to-frighten assault also 'requires proof

that the defendant intended either to cause injury or to create apprehension in the victim by

engaging in some threatening conduct[.]'"  *Id.* (quoting *Parks v. United States*, 627 A.2d 1, 5

(D.C. 1993)).  However, "[a] victim of intent-to-frighten assault 'need not be shown factually to

have experienced apprehension or fear in order to establish the offense[,]' because 'the crucial

inquiry is whether the assailant acted in such a manner as would under the circumstances portend

an immediate threat of danger to a person of reasonable sensibility.'"  *Id.* at 957–58 (quoting

*Robinson,* 506 A.2d at 575).  Finally, "mere words are not sufficient" to constitute a "threatening

act*.*"  *Cousart v. United States*, 144 A.3d 27, 32 n.11 (D.C. 2016).

Consequently, even though the APO statute no longer specifies an offense when someone

"resists, opposes, impedes, intimidates, or interferes" an officer, D.C. Code § 22–404(a)(1)

(2013), a threatening act would still violate the statute if it qualifies as an assault.  The Court thus

---

[6] This somewhat clumsy phrasing is because the "District of Columbia does not have a
separate statute criminalizing the common law offense of battery.  This omission apparently has
had little or no practical effect, but it undoubtedly has led to difficulty in defining the offense of
assault."  *Perez Hernandez*, 286 A.3d at 999.

[7] Other than being pushed by Officer Coward.

could proceed by resolving whether Sergeant Evans had probable cause to arrest Mr. Jones,

where an affirmative answer could immediately defeat Mr. Jones's *prima facie* retaliation claim

based on the threat of arrest.  But that path forward would force the Court to answer thorny

questions about when an assault has occurred as well as the scope of the narrower APO statute.

The Court is reluctant to unnecessarily wade into those waters, especially when Sergeant Evans

has also made a claim of qualified immunity.  Qualified immunity resolves this argument.

### 4.  Qualified Immunity and Mr. Jones's Clearly Established Rights

At the outset, the Court rejects Sergeant Evans's attempts to distinguish between a threat

of arrest and an actual arrest for the purposes of whether the law "clearly established" Mr.

Jones's right to speak without retaliation.  Reply at 10.  True, Mr. Jones does not identify any

case on this exact topic.  But qualified immunity does "not require a case directly on point" so

long as "existing precedent . . . placed the statutory or constitutional question beyond debate."

*Ashcroft*, 563 U.S. at 741.

"The First Amendment right to free speech is a bedrock constitutional freedom."

*Patterson v. United States*, 999 F. Supp. 2d 300, 312 (D.D.C. 2013).  Therefore, "it is well

established that where . . . there is an allegation of retaliatory arrest in the *absence* of probable

cause, the plaintiff has a viable First Amendment claim."  *Id.* at 308.  And as a prior court in this

district recognized in an opinion denying qualified immunity, "there is substantial caselaw in

which the *threat* of an arrest—even in the absence of an actual arrest—is sufficient to chill

speech, in violation of the First Amendment."  *Hartley v. Wilfert*, 918 F. Supp. 2d 45, 52 (D.D.C.

2013) (collecting cases from across circuits).  After all, "[t]he freedom of individuals verbally to

oppose or challenge [ ] action without thereby risking arrest is one of the principal characteristics

by which we distinguish a free nation from a police state." *City of Houston v. Hill*, 482 U.S. 451, 462–63 (1987).

Sergeant Evans cites *Jiron v. Roth*, 519 F. Supp. 3d 971, 1004 (D.N.M. 2021) for the proposition that there is "no controlling precedent . . . that a single threat to arrest someone is retaliatory conduct sufficient to violate a person's First Amendment rights." Reply at 10–11. The Court disagrees that this out-of-circuit case is persuasive. Even the *Jiron* court acknowledged during step-one of its qualified immunity analysis that "[n]umerous courts of appeal have found that a mere threat of official or legal action qualifies as constitutionally actionable harm." 519 F. Supp. 3d at 999. And it found qualified immunity in step-two because the case involved only "a single" threat of arrest and the court did not identify any controlling precedent on analogous facts. *Id.* at 1003–04. To endorse *Jiron's* reasoning here would say that Sergeant Evans, or any other officer in his position, could not have known it would be unconstitutional to threaten arrest purely because of a person's speech. That view is untenable.

But the crucial question is whether Mr. Jones did not just speak, but also violated the APO statute.[8]  In 2012, the Supreme Court held that it had "never recognized a First Amendment right to be free from a retaliatory arrest that is supported by probable cause." *Reichle*, 566 U.S. at 664–65. The Supreme Court would not clarify the law until 2019, when it held that no such right exists except in limited circumstances of selective arrest. *See Nieves,* 139 S. Ct. at 1724–25. It is surely true that if in 2017 there was no clearly established right to be free from a

---

[8] The D.C. Circuit has observed that "in the First Amendment context, 'the general right to be free from retaliation for one's speech' may be too broad a proposition, not sufficiently 'particularized' to make out clearly established law." *Daugherty v. Sheer*, 891 F.3d 386, 390 (D.C. Cir. 2018) (quoting *Reichle*, 566 U.S. at 665).

retaliatory arrest that is supported by probable cause, there was also no clearly established right to be free from a retaliatory *threat* of arrest that is supported by probable cause.

And so the Court sees the issue as follows.  If Mr. Jones did nothing more than engage in protected speech and Sergeant Evans responded by making a retaliatory threat of arrest, Sergeant Evans violated his clearly established First Amendment rights.[9]  *See, e.g., Patterson*, 999 F. Supp. 2d at 310 ("[T]he D.C. Circuit has expressly recognized that there is a First Amendment right not to be arrested in retaliation for one's speech.") (citing *Dellums v. Powell*, 566 F.2d 167, 195–96 (D.C. Cir. 1977)).  If Mr. Jones did more than engage in protected speech by also taking actions that would give probable cause for an arrest for assault, and therefore arrest under the APO statute, Sergeant Evans did not violate his clearly established First Amendment rights. With that formulation in mind, the Court may begin its qualified immunity analysis as to Sergeant Evans's threat of arrest.[10]

5. Mr. Jones's Speech and Conduct and Sergeant Evans's Threat of Arrest

As Mr. Jones approached the Recreation Center, Officer Coward placed his arm up against Mr. Jones and informed him that the police were holding a line in front of the Recreation

---

[9] This formulation includes the subjective test that Sergeant Evans repeatedly references in his briefing, including when he discusses the nature of Mr. Jones's clearly established rights as of 2017.  *See* Reply at 8 ("[I]t was not clearly established that Plaintiff had a right to be free from a threat of arrest that was supported by a subjective good faith belief in its lawfulness.").  While Sergeant Evans is surely correct that his purported good faith belief that he had probable cause to arrest Mr. Jones would be helpful to his motion for summary judgment, the Court believes that his briefing misidentifies how that fact plays into the legal analysis.  It goes to the *prima facie* case: evidently Sergeant Evans's threat of arrest would not have been in retaliation for Mr. Jones's expression if he had a subjective good faith belief that arrest was warranted.

[10] Another complication is that Sergeant Evans did more than threaten arrest: as discussed above, he also ran after Mr. Jones, pushed against him, and participated in a highly offensive verbal exchange with him.  The Court addresses Sergeant Evans's other conduct in a different section, *see infra* at 30.

Center and that he could not proceed forward.  Coward BWC 0:02–0:45.  Mr. Jones became upset.  *Id.*  He did not head in the other direction.  *Id.*  Instead, Mr. Jones began yelling at Officer Coward and criticizing him for touching him.  *Id.*  The Court has little difficulty finding that Mr. Jones was engaged in protected expression when he spoke against Officer Coward and accused him of assault.[11]

But Mr. Jones also placed himself only inches away from Officer Coward, shouting and jabbing his finger toward his face.  Coward BWC 0:02–0:45; Evans BWC 3:00–3:20.  The fact that this conduct occurred at the same time as his speech does not necessarily insulate him from arrest.  *See Reichle*, 566 U.S. at 668 (finding that protected speech can be a "wholly legitimate consideration" for officers when they decide whether to arrest someone).  As Mr. Jones continued to yell and dominate Officer Coward's attention and personal space, Officer Coward reacted to Mr. Jones by shoving him.  Evans BWC 3:20–3:30.  Sergeant Evans inserted himself into this encounter, and Mr. Jones shouted at Sergeant Evans that Officer Coward had assaulted him.  *Id.*  Sergeant Evans turned aggressive toward Mr. Jones and asked him three times if he wanted to go to jail.  *Id.* 3:30–3:35.  Sergeant Evans acknowledges that this statement threatened Mr. Jones with arrest.  *See, e.g.,* Reply at 7 (referring to "when he made the threat of arrest").

---

[11] Sergeant Evans does not appear to contest that Mr. Jones was engaged in protected speech.  Mr. Jones's comments, especially his later insults against Sergeant Evans, were at times offensive and likely to provoke a strongly negative reaction.  Nevertheless, the "fighting words" doctrine, which holds that speakers are not entitled to First Amendment protection for words that "by their very utterance inflict injury or tend to incite an immediate breach of the peace," *see Chaplinsky v. New Hampshire*, 315 U.S. 568, 572–73 (1942), has become "very limited" in the decades since it was first introduced, *Wood v. Eubanks*, 25 F.4th 414, 422 (6th Cir. 2022) (quotation omitted).  That doctrine is especially limited when citizens are speaking to police officers, who "are expected to exercise greater restraint in their response than the average citizen."  *Id.* at 423 (internal quotation marks and citation omitted).  Regardless, Mr. Jones's First Amendment claim does not rely on anything he said about Sergeant Evans.

Thus, the Court will turn to probable cause for this threat of arrest, emulating the approach in *Kyle*, 177 F. Supp. 3d at 396, another § 1983 arrest case.  As mentioned above, *Kyle* is not a perfect match because it addressed an older version of the APO statute, but its framework is still useful here.  Generally, the video footage renders the pertinent facts related to this incident virtually indisputable, and "[w]here the facts are not in dispute the question of probable cause is one of law to be decided by the court." *Jackson v. District of Columbia*, 541 F. Supp. 2d 334, 341 (D.D.C. 2008) (quoting *Dent v. May Dep't Stores Co.*, 459 A.2d 1042, 1044 (D.C. 1982)).  Yet because Sergeant Evans raises qualified immunity, "for the purpose of the instant qualified-immunity determination, this Court is disclaiming any duty to begin its analysis by answering the question of whether or not there was actually probable cause to arrest [Mr. Jones] under these circumstances." *Kyle*, 177 F. Supp. 3d at 396.  Whether Sergeant Evans had probable cause to reasonably believe that Mr. Jones committed APO "is prong one of the qualified-immunity test" but "[t]he Court here aims its focus on prong two[.]" *Id.* at 397 (reiterating that courts may tackle the two prongs of qualified immunity in either order).  So instead of affirmatively deciding whether Sergeant Evans had probable cause, the Court considers "whether, even assuming that there was not probable cause to arrest [Mr. Jones], the lack of probable cause under the circumstances presented here was so clearly established that [Sergeant Evans] would have had fair notice of its absence." *Id.*

Considering the lack of applicable caselaw for the current APO statute, the Court finds *Powell*, 238 A.3d at 957, to be illuminating.  There, the D.C. Court of Appeals reviewed whether there was sufficient evidence to support a conviction for a defendant who was charged with intent-to-frighten assault against a police officer under D.C. Code § 22–404(a)(1) (2013).  *See generally, Powell*, 238 A.3d.  Although *Powell* involved an assault on a police officer in 2018,

the defendant was not charged with a violation of the updated APO statute.  In fact, the case does not mention that statute at all.  *See generally, id.*  But because the APO statute is written to include an assault that would violate the provision under which the *Powell* defendant was charged, this case is applicable.

In *Powell,* 238 A.3d at 958, as captured on body-worn camera, the defendant kicked officers' vehicles, setting off a confrontation with the officers, who exited their vehicles.  *Id.* The defendant "turn[ed] to walk fast toward a police officer who had already deployed her ASP baton, while asking 'what are you going to do that for[?]'"  *Id.* at 960.  The defendant ignored the officers' shouts to "move back" and "continued to approach in an aggressive posture, getting to within arm's reach of the officers."  *Id.* at 956.  She "'was angry[,]' and 'was expressing [her] anger.'"  *Id.* at 958.  Looking at the "totality of the circumstances" the D.C. Court of Appeals emphasized that it was a "a very close question whether appellant's conduct in the street was assaultive."  *Id.*  Ultimately, it found that the evidence was insufficient for conviction because the evidence did not show the defendant "had the *mens rea* required for intent-to-frighten assault: a 'purposeful design . . . to engender fear' or 'create apprehension.'"  *Id.* at 959 (quoting *Parks*, 627 A.2d at 5).

Here, like *Powell,* Mr. Jones aggressively and angrily approached the officers.  Mr. Jones reacted to Officer Coward's command to avoid the police line by moving forward until he was inches away from Officer Coward, expressly violating instructions.  Coward BWC 0:30–0:44. Mr. Jones was loudly yelling and jabbing his finger at Officer Coward.  *Id.* 0:34–0:44.  Mr. Jones was disruptive enough to pull Officer Coward—as well as Sergeant Evans—away from their duties related to an investigative stop.  As Mr. Jones continued shouting, Sergeant Evans had to quickly enter a chaotic interaction that would have made it difficult to immediately discern

whether Mr. Jones was merely venting his anger as opposed to making threats.  After Officer Coward shoved Mr. Jones backward, Mr. Jones again came in close proximity with the officers, yelling into Sergeant Evans's face and refusing to back away or calm down.  Evans BWC 3:20–3:40.  All in all, events resemble the kind of  "very close" call seen in *Powell*.  238 A.3d at 958.

Even though the statute is different now, it continues to be true that "each APO case involves 'balancing [that] must be conducted, on a case-by-case basis, in an intensely factual analysis.'" *Johnson*, 490 F. Supp. 3d at 158 n.4 (quoting *In re C.L.D.*, 739 A.2d at 357).  To be sure, Mr. Jones's conduct had a defensive tenor at times.  He repeatedly emphasized his view that Officer Coward had just assaulted him by pushing him, and he also put his hands up more than once.  Evans BWC 3:20–3:30; Coward BWC 0:34–0:37.  But given the overall context of Mr. Jones's conduct, the Court finds that he was aggressive and threatening enough that Sergeant Evans could have reasonably believed that he had probable cause to arrest him for intent-to-frighten assault, and thus for APO.  At the least, the Court has not identified "'controlling authority' or [a] 'robust consensus of cases of persuasive authority' that . . . deprive[s] [Sergeant Evans] here of the cloak of qualified immunity."  *Kyle,* 177 F. Supp. 3d at 398, n.8 (quoting *al-Kidd*, 563 U.S. at 741–42).  And moreover, while the Court has made its best attempt to construe the differences, it is not even entirely clear how the APO statute differs from the older more expansive statute.[12]  As a result, Mr. Jones's First Amendment claim based on threats of retaliatory arrest fails at prong two of qualified immunity because it was not clearly established that Sergeant Evans was without probable cause to arrest Mr. Jones.[13]

---

[12] The APO statute was amended only a year and a half before the events in this case; nearly seven years after it was amended, the caselaw is still uncertain.

[13] Mr. Jones says, *see* Pl. Opp'n at 10, that even if there was probable cause to arrest him, he falls within the exception of being threatened with arrest when "otherwise similarly situated individuals not engaged in the same sort of protected speech had not been."  *Goodwin*, 579 F.

6.  Sergeant Evans's Other Conduct

The Court also finds that Mr. Jones cannot go forward with his First Amendment claim to the extent that it is based on Sergeant Evans's conduct that came after his threat of arrest.  In this regard, the issue is not qualified immunity, but the basic elements of the claim.[14]  Mr. Jones fails the third element of a *prima facie* First Amendment retaliation claim because he is unable to establish that his speech about Officer Coward was the "but for" cause of Sergeant Evans's actions.  *Doe*, 796 F.3d at 106–07.

The videos are helpful on this point.  While Sergeant Evans threatened Mr. Jones with an arrest relatively early in their interaction, the remainder of Sergeant Evans's alleged retaliatory conduct came only after Mr. Jones shouted in his face and told him his breath stunk.  *See* Evans BWC 3:30–3:45.  So while the spat between Sergeant Evans and Mr. Jones stemmed from the altercation between Officer Coward and Mr. Jones, it quickly took on a life of its own.  To satisfy but-for causation and sustain Mr. Jones's claim, one would have to believe Sergeant Evans remained focused on Mr. Jones's statements about Officer Coward rather than being upset by Mr. Jones belligerently yelling at and insulting him.[15]  This implausible theory runs against human nature.  More importantly, it also runs against the evidence, which shows that Sergeant

---

Supp. 3d at 172 (citation omitted); *see supra* n.3.  This argument is incorrect, as any "similarly situated individual" would have to be another person possibly committing APO, and no such person existed at the scene.  Moreover, that exception could not have been clearly established at the time because it comes from *Nieves*, 139 S. Ct. at 1727, which was decided after the events in this case.

[14] The Court does not address whether qualified immunity could also protect Sergeant Evans for this part of the retaliation claim.

[15] One would also have to believe Sergeant Evans was reacting solely to Mr. Jones's speech—that Officer Coward supposedly assaulted him, was a coward, and should be arrested— rather than Mr. Jones's conduct in disobeying and physically confronting Officer Coward.  This issue again touches on the APO statute.

Evans paid close enough attention to Mr. Jones's insults to return those same insults back at him, whether by using swear words to say that Mr. Jones's breath also stunk or by mirroring Mr. Jones's homophobic slurs.[16]  *Id.*; Thermidor BWC 5:55–6:00.

Because much of Sergeant Evans's alleged retaliation was evidently more than just a response to what Mr. Jones said about Officer Coward, the Court does not need to repeat the full chain of events between Mr. Jones and Sergeant Evans, including the extended exchange of insults, the physical contact, and Sergeant Evans's repeated attempts to chase Mr. Jones.  True, Sergeant Evans yelled at Mr. Jones that if he "come[s] up talking to us we're gonna talk back to you." *Id.* 6:15–6:30.  But Sergeant Evans did so only after he himself was insulted by Mr. Jones, defeating the idea that those remarks were about Mr. Jones "talking back" to Officer Coward and not a reference to the minute-long barrage of insults he had experienced from Mr. Jones.

To be clear, the Court is not defending the propriety of Sergeant Evans's conduct, which he admitted at his own deposition was "outrageous."  *See* Evans Deposition 81:10–82:18, Pl. Ex. 3, ECF No. 42-3.  Even in the context of Mr. Jones's offensive remarks, "[p]olice officers are held to a higher standard than average citizens, because the First Amendment requires that they tolerate coarse criticism." *D.D. v. Scheeler*, 645 F. App'x 418, 425 (6th Cir. 2016) (internal quotation marks and citation omitted).  The Court is merely assessing Mr. Jones's pleaded claim—of First Amendment retaliation because of his speech about Officer Coward—in the context of but-for causation.  That assessment finds the claim lacking in a situation where there is no plausible argument that, after the point of threatening arrest, Sergeant Evans's conduct was

---

[16] Again, Mr. Jones did not plead that Sergeant Evans retaliated against him based on any of his remarks to Sergeant Evans, which also means that the parties do not discuss, and the Court need not consider, whether Mr. Jones's insults qualify as protected expression under the First Amendment.

motivated by Mr. Jones's speech about Officer Coward rather than by Mr. Jones's speech addressed to and about Sergeant Evans.  Because but-for causation is absent, the Court goes no further in analyzing this remaining aspect of Mr. Jones's claim.  It will therefore grant summary judgment for Sergeant Evans on the entirety of Mr. Jones's First Amendment retaliation claim.

### B.  Intentional Infliction of Emotional Distress

Sergeant Evans also moves for summary judgment on Mr. Jones's IIED claim, which is now the only remaining claim in this litigation.  Before moving on to the merits of this claim, the Court must address whether it is appropriate to exercise supplemental jurisdiction over it.  The Court determines that it should not exercise jurisdiction.

Neither party has raised the issue, but the Court "has an 'independent obligation' at all stages of litigation to evaluate the contours of its own subject matter jurisdiction." *Buie v. District of Columbia*, No. 16-cv-1920, 2021 WL 4061142 at *21 (D.D.C. Sept. 7, 2021) (quoting *Hertz Corp. v. Friend*, 559 U.S. 77, 94 (2010)).  This Court's jurisdiction over Mr. Jones's common law IIED claim is "supplemental."  *See* 28 U.S.C. § 1367(a).  Even now that the Court has granted summary judgment for the defendant on Mr. Jones's federal claim, it may continue to exercise supplemental jurisdiction over Mr. Jones's pendent IIED claim under 28 U.S.C. § 1367(a).[17]  But this jurisdiction is discretionary, and

> "[t]he district courts may decline to exercise supplemental jurisdiction over a claim . . . if — (1) the claim raises a novel or complex issue of State law, (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction, (3) the district court has dismissed all claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction."

*Id.* at § 1367(c)(1)–(4).

---

[17] Mr. Jones and Sergeant Evans were both residents of the District of Columbia when this lawsuit was initiated, so the Court does not have diversity jurisdiction over this claim.  *See* Compl. ¶ 6.

"[I]n the usual case in which all federal-law claims are dismissed before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." *Shekoyan v. Sibley Int'l*, 409 F.3d 414, 424 (D.C. Cir. 2005) (quoting *Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)).  Furthermore, "courts in this jurisdiction routinely decline to exercise supplemental jurisdiction over pendent common law claims after dismissing the § 1983 claims over which they possess original jurisdiction." *Buie*, 2021 WL 4061142, at *21; *see Byrd v. District of Columbia,* 297 F. Supp. 2d 136, 143 (D.D.C. 2003), *aff'd sub nom. Byrd v. Gainer*, No. 03-7196, 2004 WL 885228 (D.C. Cir. Apr. 26, 2004) ("[T]he Court declines to exercise its supplemental jurisdiction over the remaining common law claims, but instead will dismiss them without prejudice pursuant to 28 U.S.C. § 1367(c)(3).  Plaintiff may file the remaining non-federal claims in Superior Court.").

This case falls in line with that general practice.  Importantly, the elements of an IIED claim are different than the elements of a First Amendment retaliation claim.  "Under District of Columbia law, a plaintiff seeking relief for IIED must show: (1) extreme or outrageous conduct on the part of the defendant that (2) either intentionally or recklessly (3) caused plaintiff severe emotional distress." *Daniels v. District of Columbia*, 894 F. Supp. 2d 61, 68 (D.D.C. 2012). Whether Sergeant Evans's conduct was "extreme or outrageous" may in some regards touch on now-familiar issues of probable cause, but unlike the First Amendment retaliation inquiry, the IIED inquiry does not require Mr. Jones to show that his speech was the but-for cause of Sergeant Evans's actions.  Relatedly, while Mr. Jones's retaliation claim narrowly focuses on Sergeant Evans's response to Mr. Jones's speech about Officer Coward, his IIED claim looks at the entirety of Sergeant Evans's conduct.  Compl. ¶¶ 75-81.  This is not a situation where

"Plaintiff's common law claim[] . . . mirror[s] his § 1983 claim." *Wilkins*, 2020 WL 5816591, at *16 (sustaining supplemental jurisdiction over common-law false arrest claim because "the elements of a constitutional claim for false arrest are substantially identical to the elements of a common-law false arrest claim.") (quoting *Reiver v. District of Columbia*, 925 F. Supp. 2d 1, 7 (D.D.C. 2013)).

Additionally, the Court sees "compelling reasons for not exercising jurisdiction over these claims and allowing the local court system to decide what are ultimately local issues." *Jackson v. District of Columbia*, 83 F. Supp. 3d 158, 172 (D.D.C. 2015). IIED's "outrageous" standard is highly context dependent. *See Ortberg v. Goldman Sachs Grp.*, 64 A.3d 158, 163 (D.C. 2013). And the determination of whether conduct is "extreme and outrageous" is in the first instance a question of law. *Drejza v. Vaccaro*, 650 A.2d 1308, 1316 (D.C. 1994). This case touches on important and potentially unresolved questions about when an interaction between a police officer and a resident of the District can rise to IIED, and "the D.C. Superior Court is eminently more qualified than a federal court to navigate" those questions. *Araya v. JPMorgan Chase Bank, N.A.*, 775 F.3d 409, 418 (D.C. Cir. 2014). "This is particularly true during a period when local policing practices have moved to the forefront of the District's collective conscience." *Wilkins*, 2020 WL 5816591, at *17 (declining to exercise supplemental jurisdiction over common law assault claim against police officer).

With these considerations in mind, "the Court concludes that it is most appropriate not to [exercise] supplemental jurisdiction over" Mr. Jones's IIED claim. *Id.*; *see* 28 U.S.C. § 1367(c). The Court will remand that sole remaining count to the D.C. Superior Court.

## V.  CONCLUSION

For the foregoing reasons, Defendant Timothy Evans's Motion for Summary Judgment, ECF No. 41, is **GRANTED IN PART**, and the remaining count is **REMANDED** to Superior Court.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  March 28, 2024                                    RUDOLPH CONTRERAS
                                                         United States District Judge